**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

LEANNE HIGHTOWER, an individual

      Plaintiff(s),

v.

DENVER PUBLIC SCHOOLS;
DPS BOARD OF EDUCATION

      Defendant(s).

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff, Leanne Hightower ("Plaintiff" or "Ms. Hightower") who appears individually, hereby respectfully files this action against Defendants Denver Public Schools ("DPS") and DPS Board of Education ("Board") (collectively "Defendants"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows. This action seeks injunctive relief and appropriate damages and costs.

### I.      JURISDICTION AND VENUE

1. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Federal question jurisdiction arises under the Constitution and laws of the United States of America, including but not limited to the Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), 42 U.S.C. § 1981, the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

2. The court has supplemental jurisdiction over the state-based claims below under 28 U.S.C. § 1367(a) as these claims arise out of the same transactions and occurrences.

3. Plaintiff Leanne Hightower is a resident of Denver County, Colorado.

4. Defendants DPS and the Board are located in Denver County, Colorado.

5. The wrongful acts alleged by Plaintiff occurred in whole or in part in Denver County, Colorado.

6. Venue is proper in this court under 28 U.S.C. § 1391(b)(2).

## II.     FACTUAL BACKGROUND

7. Ms. Hightower has been an educator since 2007, serving as a teacher for five years, an instructional coach and leader for three and a half years, and as a school leader for the last six years.

8. Prior to working for DPS, Ms. Hightower was a dean of students for one year at Elmwood Park High School, a school within the Elmwood Park Community Unit School District 40 in Elmwood Park, Illinois.

9. Before acting as dean of students in Elmwood Park, Ms. Hightower served as principal of Pilsen Elementary Community Academy, a school within the Chicago Public Schools District for four years.

10. Ms. Hightower moved to Denver with her husband and two children in July of 2021.

11. Ms. Hightower is a white female.

12. Ms. Hightower's husband is a black man, and her children are biracial.

13. Ms. Hightower began working for Defendants shortly after moving to Denver in July 2021. She was employed as the principal of McGlone Academy ("McGlone").

14. McGlone is a neighborhood public school within DPS.

15. McGlone serves students beginning in its early childhood education ("ECE") program up through eighth grade.

16. McGlone has a student population of approximately 870 students.

17. Of McGlone's 870 students, approximately 10% identify as Black, 88% identify as Latinx, and 2% identify as Pacific Islander. Three students at McGlone identify as White.

18. McGlone has approximately 115 staff members.

19. Of the 115 staff members at McGlone, approximately 10% identify as Black, 50% identify as Latinx, and 40% identify as White.

20. McGlone is separated into three academies—the ECE through second grade academy, the third grade through fifth grade academy, and the sixth grade through eighth grade academy ("the middle school").

21. As an incoming principal, Ms. Hightower chose to maintain the previous principal's leadership structure. This leadership structure consisted of three assistant principals, one overseeing and serving each of McGlone's three academies.

22. McGlone's three assistant principals consisted of one Black woman, one White woman, and one Asian woman.

23. While employed as the principal of McGlone, Ms. Hightower's direct supervisors were DPS Regional Instructional Superintendents Antoinette Hudson ("Dr. Hudson") and Sheri Charles ("Dr. Charles").

24. The DPS Operational Superintendent that oversees McGlone is Rachel Payne ("Ms. Payne").

25. Dr. Hudson, Dr. Charles, and Ms. Payne are all Black women.

26. Beginning in August 2021 and throughout her time as McGlone Principal, Ms. Hightower met with Dr. Hudson once a week to discuss the operation of the school.

27. At no point during any of these meetings did Dr. Hudson inform Ms. Hightower that she was displeased or concerned with how Ms. Hightower operated McGlone or how Ms. Hightower treated McGlone staff or students.

28. Conversely, Ms. Hightower and Dr. Hudson built a strong professional relationship.

29. Ms. Hightower appreciated Dr. Hudson's guidance and implemented her ideas, while Dr. Hudson seemingly approved of Ms. Hightower's leadership skills and decisions.

30. In fact, Dr. Hudson encouraged Ms. Hightower to make changes at McGlone to address the challenges that arose at the school, and challenges did, indeed, arise.

31. Within the first few weeks of the 2021-2022 academic year, middle school student behaviors emerged as a leading concern at McGlone.

32. McGlone's middle school had no consequence hierarchy or discipline structure to address the growing issue of out-of-control behaviors exhibited by students.

33. Ms. Hightower had not immediately created a consequence hierarchy because middle school assistant principal Kiara Proctor ("Ms. Proctor"), a Black woman, had informed Ms. Hightower that McGlone only practiced restorative justice, and Ms. Hightower believed Ms. Proctor could manage middle school behaviors using such practices.

34. However, as behaviors continued to escalate, Ms. Hightower decided it was necessary to implement a consequence hierarchy in the middle school.

35. Ms. Proctor disagreed with Ms. Hightower's decision to address behaviors with consequences and insisted that she be allowed to use restorative practices instead.

36. Ms. Hightower respected Ms. Proctor's perspective and proposed a compromise, which would allow Ms. Proctor to manage the restorative practices, while Ms. Hightower would manage the consequences.

37. Ms. Hightower created a thorough behavior management plan and instructed Ms. Proctor and other middle school staff how to implement the plan.

38. However, Ms. Proctor failed to fulfill her duties as middle school assistant principal by declining to follow Ms. Hightower's directives.

39. On information and belief, Ms. Proctor implemented a pattern and practice of allowing middle school students to sit in her office rather than face the consequence of a silent lunch. In particular, Ms. Proctor often allowed for four female students to sit in her office rather than attend class. These four female students happened to be Black.

40. In September 2021, Ms. Hightower hosted a parent meeting.

41. Dr. Hudson and Ms. Proctor were present during the meeting.

42. After the meeting, Dr. Hudson informed Ms. Hightower that she had overheard Ms. Proctor having very inappropriate conversations with parents about Ms. Hightower.

43. As Ms. Proctor voiced her opinions about Ms. Hightower, middle school teachers consistently voiced their own opinions about Ms. Proctor to Ms. Hightower. Specifically, teachers complained about Ms. Proctor's refusal to address behavior problems within the middle school.

44. On October 22, 2021, a McGlone teacher approached Ms. Hightower very upset because when she called the office for support because a student needed to be removed from the classroom, Ms. Proctor sent an eighth grade student to her classroom to remove the student.

45. On October 24, 2021, Ms. Hightower emailed Dr. Hudson and Caitlin Coburn, a DPS Human Resource Partner of the Far Northeast Region & department of Safety, asking for guidance on how to handle the situation as this was one of many complaints for teachers regarding Ms. Proctor's mismanagement of students.

46. Ultimately, Ms. Hightower chose to reassign Ms. Proctor's duties.

47. Ms. Hightower's decision to reassign Ms. Proctor's duties was solely based on Ms. Proctor's performance and the needs of McGlone and McGlone's students.

48. On November 12, 2021, Ms. Hightower met with Ms. Proctor to explain her new duties.

49. Ms. Proctor was assigned to work in the ECE to second grade building to support with behavior escalations throughout the day, while also providing support in the middle school during the lunch hour.

50. Ms. Proctor's main focus would shift from middle school assistant principal to an assistant principal supporting McGlone's Multi-Tier System Support team, with a focus on improving student attendance.

51. Ms. Proctor did not engage in these new duties assigned to her.

52. On November 17, 2021, Jeff Fard ("Mr. Fard"), a community activist, recorded a video to Facebook with Brandon Pryor ("Mr. Pryor"), another community activist. Along with the video, Mr. Fard posted, "Is another Black Vice Principal Being Pushed Out of DPS and

Did a White Principal Give a Black Student a Book About Jail? 30 minutes with Brandon Pryor."

53. During this video, Mr. Fard and Mr. Pryor discuss rumors around McGlone that the "new white principal from Chicago." Neither Mr. Fard or Mr. Pryor knew Ms. Hightower's name; instead, they referred to her as "Ms. Chicago" or "the new white principal."

54. Mr. Pryor and Mr. Fard stated that Ms. Hightower must be from North Chicago, where people stoned Martin Luther King Jr.

55. Numerous times throughout their conversation, Mr. Pryor and Mr. Fard stated that "she [Ms. Hightower] had to go."

56. Mr. Pryor stated that he called Alex Marrero ("Dr. Marrero"), the DPS superintendent, the other day. Mr. Pryor expressed that he felt Dr. Marrero could "make it happen," referring to Ms. Hightower's removal.

57. After Mr. Fard's post, Ms. Hightower began receiving hateful phone calls and emails, all of which referenced the fact that Ms. Hightower was White.

58. On information and belief, at least one of the callers was Ms. Proctor's friend. This caller stated "Your kids aren't all the way Black; you don't know what it's like to be a mom of Black children."

59. On November 19, 2021, Mr. Fard shared to his Facebook a video by the Chicago Teachers Union on his Facebook. He included a post with the video, stating "Needless to say, this is not the DPS McGlone principal from Chicago who is certainly not from the South Side. If so, she would not have moved the Black vice-principal away during these traumatic times,

reestablished suspending Black kids or made equity work a non-priority. It only takes one to set the work back a thousand years. #changegonecome."

60. In the fall of 2021, Ms. Proctor requested that Ms. Hightower meet and consider a contract with a local organization, Struggle of Love Foundation ("Struggle of Love") to discuss a tier two support program.

61. Dr. Hudson warned Ms. Hightower that she had had negative experiences with Struggle of Love that led her to disallow them from coming back to her previous school.

62. Still, to show support of Ms. Proctor, Ms. Hightower agreed to a 12-week contract with Struggle of Love.

63. As part of the contract, Struggle of Love would provide interventions and an anime class each day.

64. Ms. Hightower immediately began receiving complaints from teachers about Struggle of Love working in their classrooms. Mainly, classrooms were left dirty and students had been taking items from teacher's desks.

65. Struggle of Love teachers Jason McBride ("Mr. McBride"), Joel Hodge ("Mr. Hodge"), and James Marquez ("Mr. Marquez") did not follow COVID protocols; they handed out food to students and did not wear masks.

66. Ms. Hightower observed a Struggle of Love classroom.

67. During the class, Ms. Hightower observed as students were allowed to behave contrary to school rules—sitting on tables and playing and texting on their cell phones.

68. Ms. Hightower heard Mr. Hodge tell the students in the class that they were disrespectful because they did not have Black men in their lives.

69. Ms. Hightower also watched as the anime class consisted of having students copy a sexually graphic anime image.

70. Ms. Hightower made the executive decision not to renew Struggle of Love's contract for an additional twelve weeks.

71. Upon hearing this news, Mr. Marquez, who, on information and belief, was then a member of Struggle for Love and has a student at McGlone, entered McGlone's main office and began yelling at Ms. Hightower.

72. Mr. Marquez exclaimed, "I eat dinner with the Superintendent every month, and I am taking your job, you don't belong here…go back to the suburb where you live."

73. On information and belief, Struggle of Love members, such as Mr. McBride, Mr. Hodge, and Mr. Marquez, have strong connections with Mr. Fard, Mr. Pryor, Dr. Marrero, and Denver School Board members. In fact, according to the Struggle of Love website, Denver School Board Vice President Tay Anderson is a Struggle of Love team member. Struggle of Love Foundation, https://www.struggleoflovefoundation.org/team.

74. On January 20, 2022, Ms. Hightower met with J.L., a student at McGlone, and J.L.'s mother.

75. J.L. stated that she felt pressured by adults in the building to file complaints about Ms. Hightower.

76. J.L.'s mother stated to Ms. Hightower that "they are trying real hard to get you fired; I hope you make it out okay."

77. On information and belief, "they" included the members of the Struggle of Love, Mr. Fard, and Ms. Proctor.

78. On January 21, 2022, Ms. Hightower met with Dr. Charles and Christin Sahm-McKee ("Ms. Sahm-McKee"), Director of HR Strategy & Support at DPS.

79. During this meeting, Dr. Charles and Ms. Sahm-McKee explained that "an onslaught of complaints" had been filed against Ms. Hightower in the last few weeks.

80. During the January 21 meeting, Ms. Hightower was told that the District would issue a general statement communicating that Ms. Hightower was on leave while the complaints were investigated.

81. Ms. Hightower was told that this administrative leave was "for [her] protection."

82. On January 23, 2022, Mr. Fard posted the following on Facebook: "Black leaders are always under investigation and pushed out in DPS. I asked when a white leader would experience the same? It happened. The plantation is being dismantled. Stay tuned. Share."

83. This post referenced Ms. Hightower as the White leader under investigation.

84. However, it was not until January 24 that Dr. Charles and Ms. Payne sent a letter to McGlone families, informing the community that Ms. Hightower was on administrative leave.

85. On January 24, 2022, Mr. Fard posted to his Facebook a video with DPS board director Michelle Quattlebaum ("Director Quattlebaum"), which he titled "Covid, Declining Enrollment, Teacher Shortage, The Bailey Report and Dismantling the DPS Plantation. 30 Minutes with Michelle Quattlebaum."

86. During the video, Mr. Fard stated that he had been looking for a White person to be put under investigation.

87. Mr. Fard credited Director Quattlebaum with removing Ms. Hightower from McGlone.

88. On January 25, 2022, Mr. Fard posted the January 24 letter sent to McGlone families on Facebook. He posted with the letter: "I told you an investigation is underway. What's different? DPS has a history of investigating Black leaders not white ones. There are many great white school leaders, but apparently this is not one of them. The plantation is being dismantled. Stay tuned."

89. That same day, Mr. Fard also posted a video with Mr. McBride.

90. In the video, Mr. Fard and Mr. McBride discussed Ms. Hightower, again without referring to her by name but instead referring to as "the White principal" or "Becky" or "first generation Becky."

91. Mr. Fard and Mr. McBride agreed to stop saying that Ms. Hightower was from Chicago; they stated that she must be from Indiana, South Dakota, Montana, or Idaho.

92. Mr. Fard and Mr. McBride frequently referenced the fact that Ms. Hightower was White and made comments alluding to her as a White supremacist.

93. Mr. Fard repeatedly stated that he wanted to get Becky fired.

94. Mr. Fard also shared that there was a Black woman at McGlone named Ms. Proctor who should be the principal, and he again discussed "first generation Becky" moving Ms. Proctor to an alternative building, which, in reality, was the ECE to second grade building.

95. While Ms. Hightower was on administrative leave, Deborah Watson, a Black woman, led the investigation into the complaints against Ms. Hightower.

96. Ms. Hightower was cooperative throughout the investigation.

97. On April 29, 2022, DPS held a dismissal meeting for Ms. Hightower and formally declared that Ms. Hightower's employment with DPS was terminated and that she was ineligible for rehire.

98. That same day, Ms. Hightower received a termination letter from Dr. Hudson, which notified Ms. Hightower, in writing, of her dismissal from employment.

99. The letter alleged that the decision to terminate Ms. Hightower was based on "a preponderance of statements and documents from [Ms. Hightower], the complainants, and those individuals as having relevant information."

100.      The context, events, and process leading to Ms. Hightower's dismissal all confirm that Ms. Hightower's race was an impermissible motivating factor in Defendants' decision to terminate Ms. Hightower's employment.

101.      All non-discriminatory reasons for Ms. Hightower's dismissal were false and pretextual.

102.      Ms. Hightower has always performed her job duties satisfactorily and no concerns about Ms. Hightower's performance were raised with her.

103.      As evidenced by the fact that Ms. Hightower had weekly meetings with Dr. Hudson to discuss McGlone and that at none of those meetings did Dr. Hudson raise any concerns about any aspect of Ms. Hightower's job performance, any alleged complaints from McGlone staff were unfounded, and did not warrant any disciplinary action or termination.

104.      Any parent complaints regarding Ms. Hightower's performance were not founded, and none warranted disciplinary action or termination.

105.     On information and belief, many, if not all of the alleged parent complaints, were part of the racialized efforts by community activists to remove Ms. Hightower, a white woman, from DPS and McGlone, as described above.

106.     On information and belief, Dr. Hudson, Dr. Marrero, and all decisionmakers regarding the decision to dismiss Ms. Hightower, were aware of the racialized efforts to push Ms. Hightower, a white principal, out of McGlone and DPS by community activists, including other DPS and McGlone employees as described above.  This effort included numerous comments explicitly referencing Ms. Hightower's race and objecting a white person in Ms. Hightower's role.

107.     Because of this racialized effort to remove Ms. Hightower, Ms. Hightower's race was a motivating factor for Dr. Hudson, Dr. Marrero, DPS, and all decisionmakers in DPS's decision to dismiss Ms. Hightower.

108.     The process also confirms that any non-discriminatory reasons for Ms. Hightower's were pretextual and that Ms. Hightower's race was a motivating factor in Ms. Hightower's termination.  At the time of Ms. Hightower's termination, she was never given access to the statements and documents that allegedly supported the District's findings.

109.     For example, during both the dismissal meeting and in the termination letter, a letter from McGlone Staff addressed to Michelle Quattlebaum and Alex Marrero was referenced.  Allegedly, in the letter, Staff complained about Ms. Hightower.

110.     Ms. Hightower was not allowed to see the referenced letter during the termination process.

111.     Likewise, Ms. Hightower never received an explanation regarding how her own statements and documents supported the District's findings.

112.      There was no valid, non-discriminatory basis for Ms. Hightower's termination, and her dismissal from DPS was motivated by her race.

113.     Plaintiff has exhausted her administrative remedies by filing a charge with the Equal Employment Opportunity Commission ("EEOC").

114.     Plaintiff received a right to sue letter from the EEOC on April 11, 2023, and this action is filed within 90 days of her receipt of her right to sue letter.

## CLAIMS AND CAUSES OF ACTION

### A.     FIRST CLAIM FOR RELIEF
### *(VIOLATION OF 42 U.S.C. § 1981)*

115.     Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

116.     42 U.S.C. § 1981 provides that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981(a).

117.     § 1981 defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

118.     At all times relevant to this action, Plaintiff was qualified to hold the position of Head Varsity Assistant Basketball coach.

119.     Despite stellar job performance, Plaintiff was terminated.

120.     Plaintiff was terminated under circumstances that give rise to an inference of racial discrimination, and Plaintiff's termination was the culmination of a pattern of racial discrimination and harassment.

121.     Any non-discriminatory reasons alleged by Defendants for Plaintiff's termination are factually false and pretextual.

122.     Plaintiff's termination was the result of unlawful racial discrimination.

123.     Plaintiff's termination was the result of a final policymaker's decision.

124.     Dr. Marrero is a final decision maker with respect to employment decisions, such as Ms. Hightower's termination.  In the alternative, Defendants delegated final decision-making authority over employment decisions, such as Ms. Hightower's termination, to Dr. Marrero.

125.     Dr. Hudson is a final decision maker with respect to employment decisions, such as Ms. Hightower's termination.  In the alternative, Defendants delegated final decision-making authority over employment decisions, such as Ms. Hightower's termination, to Dr. Hudson.

### B.     SECOND CLAIM FOR RELIEF
### (*VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964*)

126.     Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

127.     Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment, because of the individual's race or color.  42 U.S.C. § 2000e-2(a)(1).

128.     Under *McDonnell Douglas Corp. v. Green*, cases of discrimination are evaluated using a burden-shifting analysis.  411 U.S. 792, 802 (1973).  "First, the plaintiff must establish a prima facie case of discrimination.  Second, if the plaintiff carries his initial burden, the burden shifts to the defendant to 'articulate some legitimate nondiscriminatory reason' for the challenged workplace decision.  Third, if the defendant carries this burden, the plaintiff has an opportunity to prove that the legitimate reasons the defendant offered were merely a pretext for discrimination."  *Notari v. Denver Water Dept.*, 971 F.2d 585, 588 (10th Cir. 1992).

129.     Plaintiff has exhausted her administrative remedies.

130.     At all times relevant to this action, Plaintiff was qualified to hold the position of principal at McGone.

131.     Despite stellar job performance, Plaintiff was terminated.

132.     Plaintiff was terminated under circumstances that give rise to an inference of racial discrimination, and Plaintiff's race was a motivating factor in her termination.

133.     Any non-discriminatory reasons alleged by Defendants for Plaintiff's termination are factually false and pretextual.

134.     Plaintiff's termination was the result of unlawful racial discrimination.

## C.    THIRD CLAIM FOR RELIEF
### *(42 U.S.C. § 1983 CLAIM FOR VIOLATION OF CONSTITUTIONAL RIGHTS)*

135.    Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

136.    42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…"

137.    Plaintiff is a citizen of the United States and Defendants are persons for the purposes of 42 U.S.C. § 1983.

138.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires states to treat an individual in the same manner as others in similar conditions and circumstances.

139.    As state actors Defendants are subject to the Constitutional requirements under the Fourteenth Amendment to the U.S. Constitution, to provide equal protection of the laws.

140.    At all relevant times Defendants were acting under color of state law in their capacity as a public school district.

141.    The Complaint alleges in part the deprivation of rights afforded under the Fourteenth Amendment to the United States Constitution, and Title VII, rights are clearly established, rights about which Defendants are acutely aware.

142.    In order for a municipality to be liable for damages, a plaintiff must show that his or her rights were violated pursuant to an official policy of the district or the plaintiff must

Case No. 1:23-cv-01714-RMR-SKC   Document 1   filed 07/06/23   USDC Colorado   pg 18 of 21

show that his or her rights were violated by one of the district's final policymakers. *Milligan-Hitt v. Bd. of Trs., Sheridan Cnty. Sch. Dist. No 2*, 523 F.3d 1219, 1223 (10th Cir. 2008).

143.     Defendants' decision to terminate Plaintiff was the result of final policymakers with respect to employment decisions.

144.     Dr. Marrero is a final policy maker with respect to employment decisions, such as Ms. Hightower's termination.  In the alternative, Defendants delegated final policy-making authority over employment decisions, such as Ms. Hightower's termination, to Dr. Marrero.

145.     Dr. Hudson is a final policy maker with respect to employment decisions, such as Ms. Hightower's termination.  In the alternative, Defendants delegated final policy-making authority over employment decisions, such as Ms. Hightower's termination, to Dr. Hudson.

146.     Plaintiff's termination was the official policy of Defendants.

147.     Defendants terminated Plaintiff's employment because of Plaintiff's race in violation of the Equal Protection Clause.

148.     The final policymakers' racially discriminatory employment decision and Defendants' official policy terminating Plaintiff's employment was the moving force behind the injury to Plaintiff, and the final policymakers' actions and Defendants' official policy in violation of the Equal Protection Clause give rise to municipal liability.

149.     As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her federally-protected individual rights and suffered other damages including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

150.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.  Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

### D.     FOURTH CLAIM FOR RELIEF

### (VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT)

151.     Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

152.     The Colorado Anti-Discrimination Act ("CADA") prohibits an employer from refusing to hire, discharging, promoting or demoting, harassing during the course of employment, or discriminating in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of race or color.  C.R.S.A. § 24-34-402(1)(a).

153.     The Defendants violated CADA through their wrongful acts alleged herein.

154.     Plaintiff has exhausted her administrative remedies as required under CADA.

155.     Defendants' violations of Plaintiff's rights under CADA caused Plaintiff to suffer damages, including but not limited to psychological, emotional, and reputational damages in addition to economic damages and the loss of educational and career opportunities and attorney fees and costs in this action.

### III.     DAMAGES

156.     The Defendants' discriminatory conduct alleged hereinabove has caused the Plaintiff damages, including but not limited to the following:

a. Lost wages, lost front pay, future wages, and benefits in amounts to be established at trial;

b. Emotional distress, upset, stress, and anxiety in an amount to be established at trial;

c. Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

157.     Defendants' violations of Title VII and the Equal Protection Clause were willful, entitling the plaintiff to an award of punitive damages to the fullest extent permitted by law.

## IV.     REQUEST FOR RELLIEF

Plaintiff requests that the court enter judgment in his favor and against Defendants as follows:

158.     Awarding the Plaintiff's damages for lost wages, lost front wages, benefits, and out-of-pocket expenses in amounts to be established at trial;

159.     Awarding the Plaintiff general damages for emotional distress in an amount to be established at trial;

160.     Punitive damages, pursuant to 42 U.S.C. 1981, 2000(e), in the maximum amount permitted by law;

161.     Awarding the Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

162.     Awarding Plaintiff pre-judgment interest; and

Awarding the Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

*s/ Igor Raykin*
Igor Raykin, Esq.
Michael Nolt, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846; (720) 588-9713
E-mail: igor@coloradolawteam.com; michael@coloradolawteam.com
***Attorneys for Plaintiff***